# 24-1165

## United States Court of Appeals
## for the Second Circuit

JAMAL EUBANKS, individually and as Administrator of
the Estate of JACE EUBANKS, deceased,

*Plaintiff-Appellant,*

J.E., an infant, by his father and natural guardian,
JAMAL EUBANKS,

*Plaintiff,*

*against*

DAVID HANSELL, former Commissioner, New York City
Administration for Children's Services,
JOHN and JANE ROES, said names being fictitious and
intended to represent individual attorneys, caseworkers,
investigators, youth development specialists, members,
agents, servants and/or employees of New York City
Administration for Children's Services,

*(caption continued on inside cover).*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR APPELLEES

MURIEL GOODE-TRUFANT
*Acting Corporation Counsel
of the City of New York*
Attorney for Appellees
100 Church Street
New York, New York 10007
212-356-1671 or -2490
ldisilvi@law.nyc.gov

RICHARD DEARING
JAMISON R. DAVIES
LORENZO DI SILVIO
*of Counsel*

July 29, 2024

_and_

CITY OF NEW YORK, JOHN and JANES DOES, said names being fictitious and intended to represent individual officers, members, agents, servants and/or employees of the New York City Police Department,

_Defendants-Appellees._

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................iii

PRELIMINARY STATEMENT.................................................................... 1

ISSUES PRESENTED FOR REVIEW ...................................................... 4

STATEMENT OF THE CASE ................................................................... 4

    A.  The child's tragic death at the hands of his mother's boyfriend, two weeks after defendants investigated suspected child abuse, but did not remove him from his mother's care................................................................. 5

    B.  The district court's decision dismissing the complaint for failure to state a substantive due process claim ....................... 7

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ........... 10

ARGUMENT ........................................................................................... 13

POINT I ................................................................................................... 13

    THE AMENDED COMPLAINT FAILS TO STATE A SUBSTANTIVE DUE PROCESS CLAIM ..................................... 13

    A.  The due process clause does not impose liability for defendants' failure to protect against private violence they did not assume responsibility for or create...................... 13

        1. As the child's tragic death admittedly occurred at home at the hands of the mother's boyfriend, defendants had not assumed responsibility for his safety. ............................ 17

        2. Defendants did not create or enhance the danger to the child where they did not place him in a worse position

i

# TABLE OF CONTENTS (cont'd)

**Page**

than he would have been in had he never been
interviewed or visited at home. ........................... 22

B.  The due process claim fails on the independent ground
that there are no allegations sufficient to meet the high
bar of conscience-shocking conduct. ........................ 31

1. As plaintiff admits, defendants' mere failure to
intervene does not shock the conscience............................. 32

2. Nor were defendants deliberately indifferent, where
case workers must balance competing interests of
children, parents, and the state............................. 35

C.  Defendants are in any event entitled to qualified
immunity.................................................... 41

POINT II................................................................. 44

THE REMAINING CLAIMS WERE ALSO CORRECTLY
DISMISSED ........................................................ 44

A.  The *Monell* claim fails not only because the complaint
lacks plausible allegations of a constitutional violation,
but also because it does not show that an alleged failure to
train was the moving force behind any violation. .................... 44

B.  Dismissing the claims against ACS and its former
commissioner, and declining jurisdiction over the state-
law claims, is also proper........................................ 49

CONCLUSION .................................................... 51

CERTIFICATE OF COMPLIANCE.................................... 52

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................. 29–30

*City of Los Angeles v. Heller,*
475 U.S. 796 (1986)................................................................ 44

*Coal. for Competitive Elec. v. Zibelman,*
906 F.3d 41 (2d Cir. 2018) ...................................................... 10

*Connick v. Thompson,*
563 U.S. 51 (2011)............................................................. 44–46

*Cornelius v. Town of Highland Lake,*
880 F.2d 348 (11th Cir. 1989), *overruled on other grounds
by Collins v. City of Harker Heights*, 503 U.S. 115 (1992).......... 24, 27

*Cty. of Sacramento v. Lewis,*
523 U.S. 833 (1998)........................................................... *passim*

*Dejesus v. Vill. of Pelham Manor,*
282 F. Supp. 2d 162 (S.D.N.Y. 2003).................................... 20

*DeShaney v. Winnebago County Department of Social
Services,*
489 U.S. 189 (1989)........................................................... *passim*

*Dwares v. City of New York,*
985 F.2d 94 (2d Cir. 1993), *overruled on other grounds by
Leatherman v. Tarrant Cty. Narcotics Intel. & Coord.
Unit*, 507 U.S. 163 (1993) ...................................... 23, 25, 28

*Farid v. Ellen,*
593 F.3d 233 ( 2d Cir. 2010) ............................................. 49

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Lombardi v. Whitman,*
485 F.3d 73 (2d Cir. 2007) ........................................................... *passim*

*Guan N. v. N.Y.C. Dep't of Educ.,*
2014 U.S. Dist. LEXIS 44783 (S.D.N.Y. Mar. 24, 2014) .................... 20

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ................................................................... 41

*Hernandez v. United States,*
939 F.3d 191 (2d Cir. 2019) ...................................................... 44–45

*Ingraham v. Wright,*
430 U.S. 651 (1977) ................................................................... 13

*Kennedy v. City of Ridgefield,*
439 F.3d 1055 (9th Cir. 2006) ................................................... 25, 28

*Lauro v. Charles,*
219 F.3d 202 (2d Cir. 2000) ........................................................ 49

*Lucente v. Cty. of Suffolk,*
980 F.3d 284 (2d Cir. 2020) ........................................................ 49

*Matican v. City of New York,*
524 F.3d 151 (2d Cir. 2008) ..................................................... *passim*

*Millea v. Metro-North R.R.,*
658 F.3d 154 (2d Cir. 2011) ........................................................ 19

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978) ................................................................. *passim*

*Natale v. Town of Ridgefield,*
170 F.3d 258 (2d Cir. 1999) ........................................................ 32

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't,*
   577 F.3d 415 (2d Cir. 2009) ........................................................ *passim*

*Pena v. Deprisco,*
   432 F.3d 98 (2d Cir. 2005) ........................................................ *passim*

*Phillips v. Cty. of Orange,*
   894 F. Supp. 2d 345 (S.D.N.Y. 2012) ................................................ 20

*Reed v. Gardner,*
   986 F.2d 1122 (7th Cir. 1993) .................................................. 24, 27

*Rosa R. v. Connelly,*
   889 F.2d 435 (2d Cir. 1989) ........................................................ 33

*Saucier v. Katz,*
   533 U.S. 194 (2001) ................................................................ 41

*Southerland v. City of New York,*
   680 F.3d 127 (2d Cir. 2011) ........................................................ 32

*Tenenbaum v. Williams,*
   193 F.3d 581 (2d Cir. 1999) ........................................................ 37

*V.S. v. Muhammad,*
   595 F.3d 426 (2d Cir. 2010) ........................................................ 41

*Van Emrik v. Chemung Cty. Dep't of Soc. Servs.,*
   911 F.2d 863 (2d Cir. 1990) .................................................. 37, 39, 43

*Wilkinson v. Russell,*
   182 F.3d 89 (2d Cir. 1999) ................................................... 37, 39, 43

*Yany's Garden LLC v. City of New York,*
   2022 U.S. App. LEXIS 2842 (2d Cir. Feb. 1, 2022) ................................ 50

v

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Ying Jing Gan v. City of New York,*
   996 F.2d 522 (2d Cir. 1993) ................................................................ 17

## Other Authorities

U.S. Const. amend. XIV, § 1 ................................................................ 13

N.Y.C. Charter § 396 ................................................................ 49

## PRELIMINARY STATEMENT

A case worker investigating a report alleging abuse or neglect by a child's caretaker in the home is often faced with competing demands. If they remove the child from the care of a parent or guardian, they may be accused of interfering with a constitutionally protected parent–child relationship. But if they fail to intervene, their inaction could be blamed if someone in the home later harms the child. Recognizing the need to carefully balance the rights and interests of children, their parents, and the state, courts have long held that the Constitution's due process clause does not impose liability for the state's alleged failure to better protect even a minor from private violence in their home if the state had not assumed responsibility for the child's protection and did not cause or create the harm at home.

For this reason, the U.S. District Court for the Eastern District of New York (Matsumoto, J.) dismissed the amended complaint here, which accuses defendant case workers and police officers of substantive due process violations when they received a report that four-year-old Jace Eubanks was being abused, saw injuries on the boy's body when they investigated that claim, but did not remove the child from his mother's

care before her boyfriend killed him. Jace's death is undeniably a tragedy. But, because the Constitution does not impose liability for the state's failure to better protect its citizens from private violence, this Court should affirm.

For multiple, independent reasons, the amended complaint fails to state a substantive due process claim. For twenty-five years, the Supreme Court has recognized that case workers may not be held liable under the due process clause for not removing a child from their home, even when on notice of suspected abuse or neglect, and even when they promise or take action to protect them. Though there are two exceptions to this general rule—where there is a special relationship between the state and the victim, or where the state has created or enhanced the danger to them—the complaint does not plausibly allege either. Independently, the complaint fails to plausibly allege that defendants' failure to remove Jace from his mother's care shocks the conscience, as required to plead a substantive due process claim. And, since no case clearly establishes a substantive due process violation under these facts, defendants would be entitled to qualified immunity in any event.

2

Though this Court need not reach the issue in the absence of any plausibly pleaded underlying constitutional violation, the amended complaint fails to state a claim for municipal liability, either. It does not contain any non-conclusory allegations either that defendants were deliberately indifferent to the need to better train their employees, or that this alleged failure was the moving force behind any violation of Jace's rights. The complaint similarly fails to state a claim against either the New York City Administration for Children's Services (ACS), which is not a suable entity, or its former commissioner, who is not alleged to have had any personal involvement here. And with no federal issues left, the district court correctly declined to exercise supplemental jurisdiction over the complaint's two state-law claims as well.

## ISSUES PRESENTED FOR REVIEW

1.    Does the amended complaint fail to state a substantive due process claim, where it does not plausibly allege that defendants here: (a) assumed responsibility for the child's safety while he was at home with his mother's boyfriend or created or enhanced the danger he posed; (b) engaged in conscience-shocking conduct when they did not remove the child from his mother's care; or (c) violated clearly established law of which a reasonable case worker would have been aware?

2.    Was the remainder of the complaint properly dismissed where (a) the municipal-liability claim fails absent plausible allegations that the City was on notice that its failure to train case workers was the moving force behind a violation of plaintiff's rights; and (b) the other claims—against ACS and its former commissioner, and two brought under New York common law—were properly dismissed as a matter of law?

## STATEMENT OF THE CASE

The following factual summary is drawn from plaintiff's amended complaint (*see* Appendix ("A") 6–35), accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in its favor, but without crediting legal conclusions or conclusory allegations.

4

### A. The child's tragic death at the hands of his mother's boyfriend, two weeks after defendants investigated suspected child abuse, but did not remove him from his mother's care

In August 2021, Jace and his older brother lived with their mother and her boyfriend in a Brooklyn apartment (*see* A9–10, 12). At the end of the month, ACS received a report from the children's day-care center: the boys had visible injuries, the source of which was suspected child abuse in their home (A12–13).

That day, ACS and NYPD visited the children's home, brought them along with their mother and her boyfriend to a nearby ACS office, and interviewed them (*see* A13). According to the complaint, defendants questioned the children and observed and documented scars, bruises, and other injuries, including a black eye and "numerous" marks on Jace's foot, the side of his ribs, and his chest (A13). The complaint is silent on whether anyone provided any information regarding the source of these injuries, much less whether either the mother or the boyfriend was the suspected cause (*see* A13).

Defendants allegedly knew the mother's boyfriend had a history of child abuse, including at least three reports of either child abuse or domestic violence spread out over the previous four years, and that he

5

had an outstanding warrant for violating the conditions of his release related to pending charges of domestic violence involving children (A13). Defendants allegedly promised to protect the children from harm and further indicated they would stop anyone, including the boyfriend, from injuring them in the future (*see* A13). At the end of the interview, defendants determined they did not have sufficient grounds to remove the children from their mother's care (*see* A14).[1]

Three days later, defendants conducted a home visit, where the mother, the boyfriend, and the children were all present (A14). There are no allegations that defendants observed or documented any new injuries to or concerns about either child or learned any additional information about the boyfriend (*see* A14). At the end of this visit, defendants again concluded that they did not have sufficient grounds to remove the children from their mother's care (*see* A14).

---

[1] The complaint alleges that when defendants first interviewed the family, the boyfriend had "multiple" and "still open" complaints of child abuse or domestic violence against him (A15). To the extent these complaints were in addition to the three reports defendants allegedly knew about (*see* A13), there is no allegation that any defendant was aware of any additional, outstanding complaints against the boyfriend.

6

Two weeks later, the boyfriend allegedly lifted Jace up and threw the child to the floor, causing severe injuries (A16). Tragically, the boy passed away shortly thereafter (A16–17). The cause of death was allegedly Battered Child Syndrome with blunt trauma to the torso, and the boyfriend was later arrested and charged with murder (A17).

**B. The district court's decision dismissing the complaint for failure to state a substantive due process claim**

Plaintiff, Jace's father, was appointed as the executor of his son's estate and then brought this suit, principally asserting that defendants' failure to protect the boy from the mother's boyfriend while in the home violated the child's substantive due process rights (*see* A6–35). The complaint also sought to assert claims for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and for wrongful death and negligence under New York law (A31–35).

After amendment, defendants moved to dismiss the complaint for failure to state a claim (A55–56). Defendants explained that under the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), they could not be held liable under the due process clause for failing to protect Jace from private violence

where, at the time of his tragic death at home at the hands of the boyfriend, defendants had not assumed responsibility for the boy's protection, nor had they encouraged or condoned the boyfriend's violence by simply declining to remove the child from his mother's care (A58–84). In opposition, plaintiff did not dispute that, because Jace had never been removed from his home, defendants were not responsible for his safety when the boyfriend killed him (*see* A85–106).

In a thorough, comprehensive opinion crediting the complaint's well-pleaded allegations while canvassing longstanding law on failure-to-protect claims sounding in substantive due process, the district court granted defendants' motion, dismissed the complaint for failure to state a federal claim, and declined to exercise supplemental jurisdiction over the remaining state-law claims (*see* A229–64). The court agreed that, under *DeShaney*, defendants could not be held liable for their alleged failure to protect Jace from private violence, and that the complaint had not plausibly pleaded either of the two exceptions to this general rule—that defendants either (1) created a special relationship with Jace by removing him from his home or otherwise restraining his liberty, or (2)

8

created or enhanced the danger to him by communicating through their inaction that the boyfriend could abuse Jace with impunity (A246–256).

The court concluded that the amended complaint separately failed to state a substantive due process complaint as, even with the benefit of liberal construction and while drawing all reasonable inferences in their favor, its allegations did not plausibly allege that defendants' failure to better protect Jace was conscience-shocking (A256–59). And though not required to reach the issue because the complaint did not plausibly plead an underlying constitutional violation, the court held defendants would in any event be entitled to qualified immunity where no clearly established law showed that their failure to remove Jace under these circumstances violated substantive due process (A259–60). Likewise, the court would have dismissed the *Monell* claim for the additional and independent reason that the complaint does not plausibly allege that the City was on notice that its failure to train its employees better was the moving force behind a violation of the rights of children harmed by private violence after not being removed from their homes (A260–62).

## STANDARD OF REVIEW
## AND SUMMARY OF ARGUMENT

On *de novo* review, *Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 48–49 (2d Cir. 2018), this Court should affirm. Even when "construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor," the amended complaint fails to state any claim for relief that is plausible on its face. *Id.* (quotation marks omitted).

As the district court correctly concluded, the amended complaint fails to plausibly plead a substantive due process claim. As alleged here, defendants received a report of child abuse from a mandatory reporter. Within three days, they interviewed the family and conducted a home visit. Although defendants observed injuries during this investigation, they did not remove Jace from his mother's care before her boyfriend killed him. These facts without a doubt constitute a tragedy. But the Supreme Court confronted the same facts in *DeShaney* and held they do not amount to a due process violation.

This Court has recognized two exceptions to this general rule, but neither has been plausibly pleaded here. The amended complaint acknowledges defendants never removed Jace from his mother's care, so

10

they did not restrain his liberty or assume responsibility for his safety under the special-relationship exception—and that's assuming plaintiff preserved an argument on this exception, which he did not. And beyond legal conclusions that cannot be credited even on a motion to dismiss, the complaint does not plausibly allege that defendants' failure to intervene caused or created the harm the mother's boyfriend posed or essentially communicated to him that he would be free to abuse the child without consequence.

Nor does defendants' failure to remove Jace from his mother's care constitute conduct shocking to the contemporary conscience, a distinct reason the amended complaint fails to state a substantive due process claim. Plaintiff concedes that negligence, alone, is not enough to shock the conscience. And the Supreme Court in *DeShaney* has already held that case workers' failure to intervene to prevent child abuse at home cannot constitute conscience-shocking conduct, even placing to one side the competing demands these civil servants face when investigating reports of abuse or neglect and assessing whether to impinge on a constitutionally protected parent–child relationship. Besides, because no case clearly establishes a substantive due process violation for case

11

workers' mere failure to remove a child from their home before they are harmed, defendants would be entitled to qualified immunity in any event.

Even if the amended complaint had plausibly pleaded a substantive due process violation, the municipal liability claim under *Monell* would still fail. The complaint's entire argument rests on the cases of 16 children over mostly 10 years who, like Jace, tragically died at home at the hands of a caretaker or sibling after ACS allegedly should have intervened, yet did not. But because the complaint offers only conclusory allegations that the City was indifferent to a known need for better training, and with no plausible allegations tying this to defendants' claimed failure to remove Jace when on *any* notice of suspected child abuse, the complaint cannot show any City policy or practice that caused a violation of Jace's rights.

Finally, where the only remaining claims either fail as a matter of law or arise under state law, the district court correctly dismissed them as well. ACS is not a suable entity, and its former commissioner is not alleged to have had any personal involvement in the facts alleged here. And with no federal issue left to address, it was proper to decline to

12

exercise supplemental jurisdiction over the complaint's two state-law negligence claims. This Court should do the same.

## ARGUMENT

### POINT I

### THE AMENDED COMPLAINT FAILS TO STATE A SUBSTANTIVE DUE PROCESS CLAIM

**A.  The due process clause does not impose liability for defendants' failure to protect against private violence they did not assume responsibility for or create.**

The due process clause provides that the government may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Although this provision includes a substantive component that protects against the state's "unjustified intrusion on personal security," *Ingraham v. Wright*, 430 U.S. 651, 673 (1977), no matter the "procedural safeguards" employed, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989), it does not "impos[e] liability whenever someone cloaked with state authority causes harm" through inaction. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998); *accord DeShaney*, 489 U.S. at 195–97.

Rather, the due process clause "is phrased as a limitation on the [s]tate's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. Indeed, the provision was only "intended to prevent government from abusing its power, or employing it as an instrument of oppression," with the framers choosing to leave whether and how the state should protect its citizens from one another up to "the democratic political processes," not the Constitution. *Id.* at 196 (cleaned up).[2] Put differently, nothing in the text or history of the due process clause was intended to create liability whenever the state is accused of not intervening or otherwise preventing harm. *See id.* at 195–97.

The Supreme Court has therefore held that the state's failure to protect an individual from private violence, without more, "simply does not constitute a violation of the Due Process Clause." *Id.* at 197. And the Court did so in a case that, like this one, had "undeniably tragic" facts including an abused child and a child-protective agency accused of failing to intervene in time. *Id.* at 191–93.

---

[2] "Cleaned up" refers to the omission of internal citations, quotation marks, or other editing for clarity or ease of reading.

The facts in *DeShaney* are materially the same as those here. Case workers received multiple reports over a two-year period that a father with custody of a child roughly the same age as Jace was abusing the young boy. *Id.* The child was admitted to the hospital "with multiple bruises and abrasions"; treated for "suspicious injuries" a month later; observed with injuries to his head when a case worker conducted monthly home visits over the next six months; treated for another set of injuries in the emergency room; and thereafter effectively hidden by his father when the case worker attempted to conduct two more visits to the home. *See id.* at 192–93. Tragically, the father beat his four-year-old son "so severely that he fell into a life-threatening coma," had to have brain surgery revealing "hemorrhages caused by traumatic injuries to [his] head inflicted over a long period of time," and was so injured that "he [wa]s expected to spend the rest of his life confined to an institution." *Id.* at 193.

The justices, like anyone, were of course "moved by natural sympathy … to find a way for [the child] and his mother to receive adequate compensation for the grievous harm inflicted upon them." *Id.* at 202–03. The Court agreed that the case workers in the case could be

15

characterized as having "stood by and d[one] nothing when suspicious circumstances dictated a more active role for them." *Id.* at 203. But the Court acknowledged that they could just as easily have been accused of "improperly intruding into the parent–child relationship" if they had "moved too soon to take custody of the son away from the father." *Id.* And though the Court acknowledged that individual jurisdictions are of course free to create "a system of liability which would place upon … its officials the responsibility for failure to act" in tragic situations like this one, the Court concluded that the due process clause was silent on the matter and should not be read to "thrust" upon the government liability for failing to adequately protect its citizens from private violence. *Id.*

Accordingly, no matter the notice they had of suspected child abuse, defendants may not be held liable under the due process clause for failing to protect Jace from the violence perpetuated in the home by his mother's boyfriend, as that provision does not impose an affirmative obligation on the state to provide adequate protection to its citizens. *See id.* at 195–97. True, this Court has recognized two limited exceptions to this general rule—where a special relationship exists between the state and the individual harmed, or where the state created or enhanced the danger to

16

that individual. *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). But the amended complaint here fails to allege facts plausibly implicating either exception.

> **1. As the child's tragic death admittedly occurred at home at the hands of the mother's boyfriend, defendants had not assumed responsibility for his safety.**

Though the due process clause does not ordinarily create liability for the state's failure to protect against private violence, the state "may owe a constitutional obligation to the victim of [such] violence if [it] had a 'special relationship' with the victim." *Id.* at 155 (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993)). The "linchpin" of such a relationship, however, is "involuntary custody," an affirmative act by the state where it restrains a person's liberty and thus undertakes to protect them. *Id.* at 156 (collecting cases). Examples include pre-trial detention or incarceration; an individual's involuntary commitment to a mental-health facility; or a minor child's removal from their home and placement in the care of child-protective services. *See Ying Jing Gan*, 996 F.2d at 533.

The special-relationship exception to *DeShaney* is premised on the idea that governmental restraint on a person's liberty like incarceration

"renders him unable to care for himself" and "wholly dependent on the state," thus requiring the government to assume responsibility for "basic human needs," including "reasonable safety." *DeShaney*, 489 U.S. at 200 (cleaned up). In contrast, no liability attaches when private violence befalls an individual whose liberty has not been restrained at the time of the harm.

So, for example, this Court in *Matican* found no special relationship between the police and a confidential informant, even though he agreed to identify a drug dealer while he was incarcerated. *See* 524 F.3d at 153, 155–56. Rather, because the informant was "not in custody at the time of the sting or of [the drug dealer]'s assault," and thus was not "'unable to care for himself,'" the relationship between the informant and the state "d[id] not resemble those that [this Court has] found to lie within the bounds of the special relationship exception." *Id.* at 156 (quoting *DeShaney*, 489 U.S. at 200).

So, too, here. The amended complaint does not allege defendants ever removed Jace from his home or otherwise took custody of him such that he was unable to care for himself because of defendants' actions (*see* A12–17). And the complaint concedes that his tragic death occurred at

18

home, at the hands of the mother's boyfriend (A16–17), when, of course, there could be no restraint on his liberty by the state. *See DeShaney*, 489 U.S. at 201 (no substantive due process violation where, as here, child harmed at home). Because Jace was not, at the time of his passing, "wholly dependent on the state" for "basic human needs" such as his safety and security, *id.* at 200 (cleaned up), no special relationship formed between him and defendants.

For three reasons, plaintiff's argument that Jace's liberty was restrained when he was "brought" to the ACS office two weeks before his tragic death at home at the hands of the mother's boyfriend (A13; *see* App. Br. 20–24) does not establish a special relationship. *First*, by declining to make this argument in the district court (*see* A85–106), plaintiff waived it, and cannot raise it now. *See, e.g.*, *Millea v. Metro-North R.R.*, 658 F.3d 154, 163 (2d Cir. 2011).

*Second*, even when drawing all reasonable inferences in his favor, plaintiff puts more weight on the allegation that defendants "brought" Jace to the ACS office than that claim can carry. Bringing a child, along with their parent or guardian, to an ACS office for an interview, after which the child returns home with his family just as before (*see* A13–14),

19

does not entail the kind of affirmative act of restraint required to form a special relationship.

The non-binding cases plaintiff marshals show as much. After all, the amended complaint does not allege any of the "incidents of a formal arrest" typically attending a restraint of liberty. *Dejesus v. Vill. of Pelham Manor*, 282 F. Supp. 2d 162, 170 (S.D.N.Y. 2003) (cited in App. Br. 21–22). There are no allegations of "physical coercion"; the "threatening presence of several officers"; weapons displayed; "language or tone indicating that compliance … was compulsory"; or even "a request by an officer" to go down to the police station, as opposed to the ACS office. *Id.* at 169–70. Nor is there any allegation that Jace was "pulled" out of his day care in the middle of the day, detained in a "holding" room, questioned without a parent or guardian present, *Guan N. v. N.Y.C. Dep't of Educ.*, 2014 U.S. Dist. LEXIS 44783, at *13 (S.D.N.Y. Mar. 24, 2014) (cited in App. Br. 22), or told he "had to" answer all questions put to him or else, *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 353 (S.D.N.Y. 2012) (cited in App. Br. 22). The act of temporarily bringing Jace to the ACS office with his family thus did not establish a special relationship.

*Third*, the argument misapprehends the nature of the special-relationship exception, under which the state assumes responsibility to protect a person from violence *while they are otherwise unable to fend for themselves* because of the position the government has placed them in. *See Matican*, 524 F.3d at 156 (noting that this Court's opinions focus on "involuntary custody as the lynchpin of any special relationship"). But here, Jace's tragic death admittedly took place at home, at the hands of the mother's boyfriend. Even assuming ACS had "once t[aken] temporary custody of [Jace]" by interviewing him—which, as discussed above, it did not—he admittedly returned home that same day, thus "plac[ing] him in no worse position than that in which he would have been had [the state] not acted at all." *DeShaney*, 489 U.S. at 201. To make defendants "the permanent guarantor of [a child's] safety" after an interview in an ACS office would not only contravene the Supreme Court's holding in *DeShaney*, but also turn the special-relationship exception on its head. *Id.*[3]

---

[3] To the extent plaintiff claims defendants' alleged promise to protect Jace created a special relationship (A13; *see* App. Br. 20–21), that, too, misapprehends the exception. The informant in *Matican* was also promised protection, but that did not create a special relationship, which instead focuses on whether the state had restrained the

*(cont'd on next page)*

**2. Defendants did not create or enhance the danger to the child where they did not place him in a worse position than he would have been in had he never been interviewed or visited at home.**

Whereas "special relationship liability arises from the relationship between the state and a particular victim" and sounds in involuntary custody, the second exception to the general rule against liability for the government's failure to act arises instead "from the relationship between the state and the private assailant." *Pena v. Deprisco*, 432 F.3d 98, 109 (2d Cir. 2005) (quotation marks omitted). Under this exception, the state may be held liable only if it "affirmatively created or enhanced the danger of private violence." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009).

Affirmative conduct is the linchpin for the second exception. *See Pena*, 432 F.3d at 109–10. A state-created danger is not triggered by the government's mere failure to intervene—even when on notice of a need to protect, *e.g.*, *Lombardi v. Whitman*, 485 F.3d 73, 79–81 (2d Cir. 2007), and even after it has promised to do so, *DeShaney*, 489 U.S. at 200.

---

informant's liberty at the time of harm, not any promises it had previously made to him. *See* 524 F.3d at 153, 155–56.

After all, in *DeShaney*, the Supreme Court necessarily rejected the idea that the government has an "affirmative constitutional duty to provide adequate protection" whenever it "learns that a particular child is in danger of abuse from third parties and [even] undertakes to protect him from that danger." *Id.* at 194–97. And this Court has found no state-created danger in numerous situations where, as here, state actors were accused of simply failing to act. For example, there was no liability in *Matican* for the police officers' alleged "fail[ure] to learn about, or inform [plaintiff] of, [the assailant]'s violent criminal history" or even "his release on bail." 524 F.3d at 157–58. And the same was true in *Pitchell v. Callan*, where an officer failed to intervene to prevent a colleague from shooting a person during an altercation. 13 F.3d 545, 549 (2d Cir. 1994).

Rather, plaintiffs seeking to state a substantive due process claim based on a state-created danger must meet a high bar, by showing that government officials in some affirmative way "assisted in creating or increasing the danger to the victim." *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163, 164 (1993). Although this can occur across "a wide range of disparate fact patterns,"

23

*Pena*, 432 F.3d at 108, the through-line in cases applying this exception is an affirmative act by the state rendering the victim less safe, "ratcheting up the threat of danger," or otherwise placing them in a more dangerous position than they would have been in had the state taken no action at all, *see, e.g.*, *Okin*, 577 F.3d at 430–31 (collecting cases).

For example, this Court has applied the state-created-danger exception to state actors who essentially create the means by which a perpetrator harms their victim. Consider *Hemphill v. Schott*, where the police were called to the scene of a drugstore robbery, allowed the store manager to join them in pursuing the suspect, and gave him a gun that he then used to shoot the suspect. 141 F.3d 412, 414–15, 418–19 (2d Cir. 1998); *accord Reed v. Gardner*, 986 F.2d 1122, 1123–24 (7th Cir. 1993) (police left intoxicated passenger in car with keys); *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 349–50 (11th Cir. 1989) (town clerk abducted by inmates only after they had been hired to work at town hall), *overruled on other grounds by Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992). Similarly, state officials have been found to have facilitated or enabled harm in situations where they "out" a confidential informant to the person they inform on. *See Matican*, 524 F.3d at 158;

*accord Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (officer told assailant victim had filed report against him).

This Court has also applied the state-created-danger exception to a second line of cases, where government officials explicitly or implicitly communicate to private actors that they have "the freedom to harm others without risk of a law enforcement response." *Okin*, 577 F.3d at 428. Take *Okin*, in which an abuser admitted to police officers whom he socialized with at a bar he partly owned that he could not "help it sometimes when he smack[ed] [his girlfriend] around," but the officers did next to nothing. 577 F.3d at 420–26. Even after the victim called the cops 18 times over 15 months, their only response was to discuss sports with the abuser, express camaraderie with him, and "laugh[] at" the victim for making a complaint. *Id.* Likewise, the police in *Dwares* assured skinheads that "unless they got completely out of control [they] would neither interfere with their assaults nor arrest them," all while the officers looked on, thus giving the skinheads "prearranged official sanction" for their violence. 985 F.2d at 97, 99. And in *Snider v. Dylag*, a prison guard told inmates it was "open season" on another prisoner,

whom the inmates then viciously attacked. 188 F.3d 51, 52, 55 (2d Cir. 1999).

True, an "implicit message that [state actors] condone[]" conduct or otherwise convey to an abuser that they can "continue to engage in [abuse] with impunity" would also implicate the state-created-danger exception. *Okin*, 577 F.3d at 429, 430–31. But while a state actor need not expressly communicate such approval, "repeated, sustained inaction" tantamount to "assur[ing]" the abuser that they are free to engage in violence is required. *Id.* at 428 (quotation marks omitted).

This Court found that high standard met in *Pena*, which involved a police officer whose supervisors knew he had a "history of drinking problems," yet "continued to drink heavily" while working at the NYPD, and would even regularly drink with other officers, whether on- or off-duty, at or near the precinct in full view of the public. 432 F.3d at 103. Despite knowing all this, his bosses never "questioned, disciplined, or counseled" the officer about his alcohol abuse. *Id.* One day, the officer went on a 12-hour bender, which included other officers, and drove back to the precinct—with one of his supervisors in the passenger seat. *Id.*

Several other officers even saw the officer "visibly intoxicated" at the precinct, but no one "did anything to reprimand him or to prevent him from leaving, returning to the driver's seat," and taking off. *Id.* The officer then ran several red lights, killing three people, including a woman about to give birth. *Id.* at 102–03. This Court agreed this persistent history of notice, acquiescence, and even participation in the officer's drinking meant the defendants had tacitly communicated that he was "free to drink to excess and drive in that condition," "affirmatively condoned" his dangerous behavior, and "indicated to [the officer] that he would not be disciplined for his conduct." *Id.* at 110–11.

Here, in contrast, and even with the benefit of liberal construction, the allegations in the amended complaint are far afield from any of the situations where this Court has found a state-created danger. For instance, there is no allegation that defendants created the means for the mother's boyfriend to harm Jace, whether by providing or leaving him with a weapon, *see Hemphill*, 141 F.3d at 414–15, 418–19; *Reed*, 986 F.2d at 1122–23, bringing the boyfriend into Jace's home, *see Cornelius*, 880 F.2d at 349–50, or identifying someone who had confidentially reported

27

him for child abuse, *see Matican*, 524 F.3d at 158; *Kennedy*, 439 F.3d at 1063.

Nor are there any allegations in the amended complaint that defendants expressly communicated to the mother's boyfriend that he could abuse Jace with impunity, whether by being buddies with him and laughing at the report of suspected child abuse they received, *see Okin*, 577 F.3d at 420–26, telling him it was "open season" on the child, *see Snider*, 188 F.3d at 52, 55, or promising not to intervene while watching the boyfriend harm Jace—so long as he did not "g[e]t completely out of control," *see Dwares*, 985 F.2d at 97, 99.

And there are no plausible allegations that defendants engaged in "repeated, sustained inaction" that was the functional equivalent of "assur[ing]" the mother's boyfriend that he was free to abuse Jace free from consequence, either. *Okin*, 577 F.3d at 428 (quotation marks omitted). An interview followed by a home visit three days later, at the end of which defendants determined there were not enough grounds to remove Jace from his mother's care (*see* A13–14) is not the same as doing next to nothing (other than discussing sports) in the face of 18 urgent 911 calls over nearly as many months, *see Okin*, 577 F.3d at 420–26. Nor is

28

there an allegation comparable to the claim in *Pena* that defendants watched while someone drank for 12 hours straight, joined him on his bender, and then either got into a car he was too drunk to drive or watched him veer off when they could have taken away his keys. *See* 432 F.3d at 102–03.

Instead, plaintiff's strongest argument is that defendants received a report of suspected child abuse from a mandatory reporter; knew the boyfriend had a history of such abuse; observed injuries on Jace's body; twice met with the child and his family over three days; but ultimately declined to remove the boy from his mother's care (A12–14; *see* App. Br. 25). Yet whether taken together or considered separately, these allegations do not add up to a state-created danger under controlling case law, which has been quite careful "to tread a fine line between" a failure to intervene, which is not actionable, and affirmative conduct that places a victim in a worse position than they would otherwise have been in, which is. *Pena*, 432 F.3d at 109.

To start, the repeated refrain in the amended complaint—that defendants communicated to the mother's boyfriend that they "w[ould] not interfere, arrest or punish him" (A15–16; *see* App. Br. 26)—is a legal

conclusion "devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted) (cited in App. Br. 28). It therefore cannot be credited, even on a motion to dismiss. *See id.*

Next, even accepting that defendants knew the mother's boyfriend had a history of child abuse and saw injuries on Jace's body (A13), that alone cannot be dispositive of whether defendants created or enhanced the danger to the child (*contra* App. Br. 25–26). Even when the state is on notice of the need to protect a minor from harm, and even when it promises or undertakes to do so, that does not entail a state-created danger under binding precedent, *see, e.g.*, *DeShaney*, 489 U.S. at 194–97, 200; *Lombardi*, 485 F.3d at 79–81.

What remains, then, is two meetings with Jace and his family over a three-day period, followed by a decision not to remove the child from his home before his tragic death at the hands of the mother's boyfriend two weeks later (*see* A13–17). But these same basic facts were present or even stronger in *DeShaney*. *See* 489 U.S. at 192–93. Faced with these unquestionably terrible facts, the Supreme Court still ruled they were insufficient to conclude that the defendants' failure to better protect a young child from harm at the hands of his father had in any meaningful

way caused or increased that harm. *Id.* at 195–97, 201–03. And if that conduct could not have effectively communicated to the father in *DeShaney* that he would "not be arrested, punished, or otherwise interfered with," *Pena*, 432 F.3d at 111, those same actions could not, as a matter of law, have "condon[ed]" or "emboldened" the mother's boyfriend here (*contra* App. Br. 29).

*       *       *

Ultimately, and even while crediting the amended complaint's allegations that defendants were "aware of the dangers that [Jace] faced in the free world," because they "played no part in their creation," and moreover did not "do anything to render him any more vulnerable to them," defendants may not be held liable under the due process clause for failing to intervene. *DeShaney*, 489 U.S. at 201.

## B. The due process claim fails on the independent ground that there are no allegations sufficient to meet the high bar of conscience-shocking conduct.

Even if the amended complaint plausibly alleged a substantive due process violation—and it does not—the claim would still fail, as the complaint does not fulfill the additional and independent requirement (*accord* App. Br. 31) of alleging conduct that is "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience" here. *E.g.*, *Lewis*, 523, U.S. at 847 n.8; *accord Southerland v. City of New York*, 680 F.3d 127, 151–53 (2d Cir. 2011); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) (collecting cases). After all, "lest the Constitution be demoted to … a font of tort law," *Lewis*, 524 U.S. at 847 n.8, courts have consistently required that there be conscience-shocking conduct, which works to "screen[] out all but the most significant constitutional violations," *Matican*, 524 F.3d at 155. But here, there is no such conduct alleged in the complaint.

### 1. As plaintiff admits, defendants' mere failure to intervene does not shock the conscience.

To be sure, what constitutes conscience-shocking behavior is "no calibrated yard stick," but instead demands "an exact," fact-bound, case-by-case analysis. *Lewis*, 532 U.S. at 847, 850. What is clear, however, is that this standard sets a high bar, focused on the outer "ends of the tort law's spectrum of culpability," not the simple negligence alleged here. *Id.* at 848; *accord DeShaney*, 489 U.S. at 195–98.

Indeed, the Supreme Court in *Lewis* squarely "rejected the lowest common denominator of customary tort liability," explaining instead that "liability for negligently inflicted harm is categorically beneath the

threshold of constitutional due process." *Lewis*, 532 U.S. at 848–49. And in *DeShaney*, a case on all fours with this one, the Court expressly rejected the idea that even if the state is on notice of a danger to a minor, and moreover promises or even undertakes to protect the child against it, its failure to adequately do so is conscience-shocking. 489 U.S. at 195–98. It is not, as the failure to act is not alone enough. Instead, only "conduct intended to injure in some way unjustifiable by any government interest" qualifies as conduct shocking to the contemporary conscience. *Lewis*, U.S. at 849.

The amended complaint does not meet this standard. To begin with, as the district court correctly observed (*see* A257), the complaint does not allege that defendants' actions were "arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989). Rather, its allegations sound in the failure to act or otherwise intervene to better protect Jace from abuse at the hands of his mother's boyfriend (*see* A257 (marshalling 17 paragraphs essentially alleging defendants "negligently failed to provide for the safety, security and protection of [Jace]")).

33

Yet as plaintiff admits, this alleged negligence "by itself does not satisfy the 'shock the conscience' test" (App. Br. 31). The Supreme Court in *Lewis* explicitly said so. 532 U.S. at 847–49. And the Court in *DeShaney* necessarily rejected the idea that the state's failure to intervene in the face of repeated reports of abuse and multiple head injuries documented monthly for six months sufficed to show sufficiently shocking conduct. *See* 489 U.S. at 195–98. But by focusing on these very same facts—the mandatory report received, injuries documented on Jace's body, the boyfriend's history of child abuse, and defendants' decision not to remove the boy from his mother's care (*see* App. Br. 31–37)—plaintiff's argument ignores that the Supreme Court has already held that this conduct is not conscience-shocking, no matter how much defendants suspected abuse, promised to address it, or took actions to protect Jace from it.[4]

---

[4] Plaintiff's argument also focuses on the conclusory assertion that defendants "communicated" to the mother's boyfriend that he would not be arrested, punished, or stopped from abusing Jace (*see* App. Br. 31–36). But as explained above at pages 22 to 31, the amended complaint does not plausibly allege any such condonation.

34

**2. Nor were defendants deliberately indifferent, where case workers must balance competing interests of children, parents, and the state.**

Recognizing that defendants' simple failure to act as alleged in the amended complaint cannot shock the conscience, plaintiff focuses on deliberately indifferent acts (*see id.*), which can constitute conscience-shocking conduct in the right case—but only if, unlike here, such acts are plausibly alleged in the operative complaint. They were not in this case, as deciding whether to remove a child from a parent's care requires case workers to balance competing interests free from fear that they will be held liable under the due process clause.

Both the Supreme Court and this Court have long recognized that the bar to show conscience-shocking conduct is even higher in situations, such as this one, where officials are subject to "the pull[] of competing obligations." *Lewis*, 523 U.S. at 853; *see Matican*, 524 F.3d at 159. In *Lombardi*, for instance, federal officials charged with the rescue and cleanup of the World Trade Center after the 9/11 attacks were accused of falsely assuring locals that the air in Lower Manhattan was safe to breathe, which led some of those participating in search, rescue, and clean-up operations to forgo protective gear. 485 F.3d at 75. Even though

35

the officials were alleged to have knowingly lied about, and thus been deliberately indifferent to, the health risks, this Court recognized that they had to account for competing demands—worker safety, on one hand; a rapid response to a terrorist attack, on the other. *See id.* at 82–85. The Court instead concluded that conflicting obligations counsel against imposing broad constitutional liability, which avoids the chilling effect the threat of lawsuits could pose to needed decision-making. *See id.*

Next, this Court applied that same rule in *Matican*, where officers were accused of negligently staging a sting operation so that the target learned the identity of the plaintiff who had informed on him and then assaulted him. 524 F.3d at 154, 159. The Court again recognized that the officers in that case "had two serious competing obligations" when planning the operation—the informant's "safety and their own." *Id.* at 159. This, the Court explained, meant the exercise of the officers' professional judgment in staging the arrest of "a potentially violent drug dealer" could not be considered conscience-shocking. *Id.* Indeed, the Court was "loath to dictate to the police how best to protect themselves and the public," especially as such intervention might "require officers to

use riskier methods," leading to potentially greater harm to the officers or others. *Id.*

And this Court has acknowledged that case workers are especially subject to the pull of competing obligations. Not only has it expressly recognized the need to balance "the rights and interests of parents, children, and the [s]tate" in the child-protective context. *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999), but the Court has also afforded case workers "unusual deference" when they investigate allegations of abuse or neglect of a child. *See, e.g.*, *Wilkinson v. Russell*, 182 F.3d 89, 104–05 (2d Cir. 1999); *accord DeShaney*, 489 U.S. at 203.

This deference to case workers makes sense. As this Court has explained, such civil servants often confront "pressurized circumstances" requiring them to choose "between difficult alternatives" based on only "limited or conflicting information." *Wilkinson*, 182 F.3d at 105 (cleaned up). "If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights." *Van Emrik v. Chemung Cty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990). But if, as here, "they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights" instead. *Id.*

Because defendants' decisions were subject to the pull of these competing obligations, any failure to balance those conflicting demands differently cannot be considered conscience-shocking as a matter of law. *See Matican*, 524 F.3d at 159. And this is true "regardless of whether the situation [is] a time-sensitive emergency" and, thus, opportunity for reflection exists. *Id.*

This is so for several sound policy reasons. As this Court explained in *Lombardi*, the proper balancing of competing considerations is best left to the "the conscience of the one who must make such decisions," and the political process, not the Constitution. *See* 485 F.3d at 82–85; *accord Lewis*, 524 U.S. at 847 n.8; *DeShaney*, 489 U.S. at 202–03. The courts should not lightly impose liability for failing to balance relevant factors adequately under a constitutional provision framed as protection against government overreach, especially where the threat of lawsuits could chill crucial decision-making in sensitive areas. *Lombardi*, 485 F.3d at 84.

And this Court in *Matican* reasoned that, were it to substitute its judgment and find that the police officers in that case had not properly balanced their safety as against the informant's, and thus acted with deliberate indifference, that could lead to the "use [of] riskier methods,"

38

perhaps doing even greater harm. 524 F.3d at 159. That is consistent with this Court's case law repeatedly recognizing "unusual deference" when assessing, with the benefit of hindsight, what case workers should or should not have done, where, no matter what, they may be accused of violating someone's rights. *See, e.g.*, *Wilkinson*, 182 F.3d at 104; *Van Emrik*, 911 F.2d at 866. The Supreme Court has even recognized as much, rejecting, in *DeShaney*, the argument that the failure to remove a child from the home, even where abuse is suspected, can ever on its own constitute conscience-shocking conduct. *See* 489 U.S. at 194–97, 203. Where competing considerations must be weighed, balancing those factors differently than a plaintiff would have wanted cannot constitute deliberate indifference, and thus conduct shocking to the contemporary conscience.

True, this Court in *Okin* cited the "pull of competing obligations" standard, but nevertheless found conscience-shocking conduct in that case. 577 F.3d at 431–32 (cited in App. Br. 35–36). For three reasons, the same is not true here. *First*, the police faced no conflicting demands in *Okin*. No one has the right to abuse a domestic partner—but a parent like the mother here enjoys a constitutional right to the continued care,

39

custody, and control of her children. *Tennenbaum*, 193 F.3d at 593–94; *accord Pena*, 432 F.3d at 113–14 ("Not condoning egregious drunk driving does not ordinarily clash with other equally important governmental responsibilities." (quotation marks omitted))

*Second*, the reasoning in *Okin* relied in part on the notion that the police officers there had "the opportunity for deliberation"; they received 18 calls reporting domestic violence in the span of almost as many months. 577 F.3d at 431. But the same cannot be said here. For one thing, competing obligations must trump any opportunity for deliberation. After all, the defendants in both *Lombardi* and *Matican* had such an opportunity, but that was not dispositive.

And for another, the amended complaint alleges that defendants twice met with Jace and his family over three days, after which they had no further contact until the boy's tragic death by the mother's boyfriend two weeks later (*see* A13–17). Again, setting aside that the defendants in *DeShaney* were on notice of suspected child abuse for *two years*, yet were not found to have engaged in conscience-shocking conduct, *see* 489 U.S. at 192–93, this two-week period is not remotely comparable to the 15 months in *Okin* where the police sat on their hands. *Accord Pena*, 432

40

F.3d at 114 (referring to "days, weeks and months" of defendants' inaction).

And *third*, to find defendants' conduct here—failing to remove a child from their home, even though defendants knew or should have known he was being abused—deliberately indifferent and therefore conscience-shocking would countermand the Supreme Court's contrary decision, based on those very same facts, in *DeShaney*. *See* 489 U.S. at 195–98. This Court's fact-bound decision in *Okin* cannot carry that weight.

## C. Defendants are in any event entitled to qualified immunity.

Even if the amended complaint plausibly pleaded a substantive due process claim—which again, it did not—this Court may still affirm on the grounds of qualified immunity. This doctrine shields defendants from liability where, as here, "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010). But because defendants did not deprive plaintiff of substantive due process, as discussed above

41

starting at page 13 (*contra* App. Br. 38–41), this Court need not go further. *See DeShaney*, 489 U.S. at 202 n.10.

Even if defendants had committed a substantive due process violation, they would still be entitled to qualified immunity so long as any violation was not "clearly established" at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Only if it would have been clear to defendants that their "conduct was unlawful in the situation" they faced would they lose the protections qualified immunity is designed to afford. *Pena*, 432 F.3d at 114.

Here, even with the benefit of liberal construction, that cannot be said of the amended complaint's allegations. Defendants could not have known their conduct was unlawful where no case has held that failing to remove a child from their home under the circumstances here could (1) establish a special relationship; (2) create or enhance the danger of private violence; or (3) amount to conscience-shocking behavior. And for good reason: *DeShaney* necessarily rejected the argument that a failure to remove under materially the same circumstances could establish any of these necessary elements. *See* 489 U.S. at 195–98.

Plaintiff points out that the two exceptions to the general rule that the due process clause does not create liability for the failure to protect against private violence were clearly established at the time of the events underpinning the amended complaint (App. Br. 39–40). True enough, but the argument presupposes that the amended complaint plausibly implicates either exception, which it does not, or shows why a case worker in defendants' shoes reasonably should have known that either was, which they did not.

That aside, "it is well settled that child protective services workers are entitled to qualified immunity for their conduct during the course of abuse investigations" such as the one here. *Wilkinson*, 182 F.3d at 99. Because case workers often must "choose between difficult alternatives," qualified immunity protects defendants when making this choice, provided that, as here, "there is an objectively reasonable basis for their decision, whichever way they make it." *Van Emrik*, 911 F.2d at 866. As defendants could just as easily have been accused of "infringing the [mother's] constitutional rights" had they removed Jace from her care, an objectively reasonable basis "existed in this case." *Id.*

43

## POINT II

## THE REMAINING CLAIMS WERE ALSO CORRECTLY DISMISSED

The amended complaint does not plausibly allege any violation of plaintiff's rights, much less that defendants were deliberately indifferent to an alleged failure to train its employees that was also the moving force behind any deprivation of his rights. The claims against ACS and its former commissioner were also required to be dismissed. And the only remaining claims—for wrongful death and negligence arising under New York law—were correctly dismissed in the absence of any federal issues left to consider.

### A. The *Monell* claim fails not only because the complaint lacks plausible allegations of a constitutional violation, but also because it does not show that an alleged failure to train was the moving force behind any violation.

Setting aside the amended complaint's failure to properly plead any underlying violation of plaintiff's constitutional rights (*contra* App. Br. 42), which alone defeats his *Monell* claim here, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the claim separately fails given the absence of any plausible allegations that defendants' alleged failure to

44

train its case workers was the moving force behind a claimed deprivation of his rights (*contra* App. Br. 41, 44–48).

To state a failure-to-train claim under *Monell*, the amended complaint had to plausibly allege that defendants' purported failure to train its employees amounted to "deliberate indifference" to the rights of children who are not removed from their homes despite reports of abuse or neglect and evidence of injuries (*see* App. Br. 43; A21–24). *See Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Hernandez v. United States*, 939 F.3d 191, 206 (2d Cir. 2019). To meet this "stringent standard," the complaint needed to allege (1) that defendants had actual or constructive notice from a pattern of sufficiently similar constitutional violations that its training or supervision was deficient, and (2) that it failed to address this issue. *See Connick*, 563 U.S. at 61; *Hernandez*, 939 F.3d at 206–07. And any failure to train must also have been "the moving force behind the constitutional violation" in this case. *Connick*, 563 U.S. at 61; *Hernandez*, 939 F.3d at 207.

That 16 other children tragically succumbed to injuries due to domestic violence by another member of their household over a mostly 10-year period (*see* A21–24) does not satisfy this "stringent standard" to

state a failure-to-train claim. *Connick*, 563 U.S. at 61. Apart from speculation, the amended complaint does not connect the dots between an alleged failure to train case workers generally to a violation of plaintiff's specific rights by any of the defendants involved in this case. Instead, the complaint's principal theory of liability is that defendants deprived plaintiff of his right to substantive due process by not removing him from his mother's care the moment they received a mandatory report of suspected child abuse and observed injuries on Jace's body (*see* A12–16). The "moving force" for this claimed violation, then, was the failure to intervene when on *any* notice of suspected child abuse—not the alleged failure to train defendants to further investigate or inquire into such notice by, for instance, seeking medical clearance, interviewing others, or following up on the known criminal history of someone in the home (*see* A18–20; *contra* App. Br. 44–48).

Separately, the amended complaint does not identify a sufficient through-line that connects the 16 tragic deaths it alleges to each other, much less to this case, beyond the argument that case workers should have done something more in each instance. But the Supreme Court has made clear that "incidents [that] are not similar to the violation at

46

issue"—the failure to disclose exculpatory evidence in *Connick*; the failure to remove Jace from his mother's care as soon as defendants received the report from his day care and saw injuries to his body here—cannot put the City on notice "that *specific* training was necessary to avoid [a claimed] constitutional violation." 563 U.S. at 62–63 (emphasis added). But several of the terrible deaths the complaint points to involved greater notice and opportunity to intervene, distinct abusers, or older children whose injuries might be explained differently (*contra* App. Br. 43).

For example, Julissia Batties passed away after ACS had removed her from the home (A22), something that did not happen here. There were "multiple complaints" and reports that Legacy Beauford, Aisyn Gonzalez, Elisa Izqueirdo, and Marchella Brett-Prince were being abused (A22–23), as opposed to the single report defendants received for Jace (A12–13). Sabrina Green was absent "for weeks and months" from school before her sister killed her, and Daytwon Bennett's mother had an "*eight*-year history" of abusing her son (A23 (emphasis added)). Plus, he and Marchella were each "severely emaciated" when they died (A23), obvious

injuries that could only be explained by abuse or neglect by a parent or guardian responsible for feeding them.

Further, a parent or sibling, not a boyfriend who lacks the same constitutional right to familial association, was responsible for at least five of the deaths the amended complaint compiles—Julissia's, Lisa Steinberg's, Elisa's, Sabrina's, and Marchella's (A22–23). And seven of the children were at least two to five years older than Jace was when his mother's boyfriend killed him: Sabrina was nine; Julissia, Nixzmary Brown, and Sierra Roberts were seven; and Lisa, Elisa, and Zymere Perkins were six (A23). But in cases involving injuries to older children, a "black eye" or other bodily injuries (A13) might just as reasonably be explained by a tumble on the playground as by abuse at the hands of a parent or guardian. In other words, different calculations are required depending on the injury and the age of the child.

Critically, none of the tragic deaths marshalled in support of the *Monell* claim here involved a single report of child abuse, two meetings with the subject child over just three days, and a simple failure to intervene over the next two weeks before a boyfriend tragically killed the minor.

48

Separately, plaintiff argues that no notice was required where the moving force behind Jace's death was purportedly a "persistent and widespread" pattern of neglect (*see* App. Br. 43–44 (quoting *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020))). But for inaction by non-policy-makers such as defendants here to "have the force of law" sufficient to rise to the level of municipal policy, practice, or custom under *Monell*, defendants' supervisors must have "consistently ignored" a "widespread pattern" of "open[,] … notorious," and intentionally "abusive conduct" by specific actors. *Lucente*, 980 F.3d at 297–308 (discussing "acquiesc[ence]" in one officer's repeated sexual harassment and abuse of multiple inmates in his care over 18 months). The inaction alleged in the complaint, and by numerous actors across each of the City's five boroughs peppered over 10 or more years, does not meet this high bar.

**B. Dismissing the claims against ACS and its former commissioner, and declining jurisdiction over the state-law claims, is also proper.**

Finally, though plaintiff does not address these issues in his brief (*see generally* App. Br.), the amended complaint fails to state a claim against either ACS, which is not a suable entity under longstanding law, *see* N.Y.C. Charter § 396; *Lauro v. Charles*, 219 F.3d 202, 205 n.2 (2d Cir.

49

2000), or ACS's former commissioner, who is not alleged to have had any "personal involvement" in any of the actions the complaint alleges, *Farid v. Ellen*, 593 F.3d 233, 249 ( 2d Cir. 2010).

And with no federal issues left to address, the district court correctly declined to exercise supplemental jurisdiction over the only remaining claims in the case, for wrongful death and negligence arising under New York law (*see* A31–35, 262–63). As this Court has repeatedly explained, generally, when "all federal claims are dismissed before trial, the state claims should be dismissed as well." *Yany's Garden LLC v. City of New York*, 2022 U.S. App. LEXIS 2842, at *6 (2d Cir. Feb. 1, 2022) (quotation marks omitted). The Court should therefore affirm the district court's decision to follow this well-treaded path and decline jurisdiction over the amended complaint's state-law claims.

## CONCLUSION

This Court should affirm.

Dated:   New York, New York
         July 29, 2024

                                        Respectfully submitted,

                                         MURIEL GOODE-TRUFANT
*Acting Corporation Counsel*
*of the City of New York*
Attorney for Appellees

By:   /s/ Lorenzo Di Silvio_____
      LORENZO DI SILVIO
      Assistant Corporation Counsel

      100 Church Street
      New York, New York 10007
      212-356-1671
      ldisilvi@law.nyc.gov

RICHARD DEARING
JAMISON R. DAVIES
LORENZO DI SILVIO
   *of Counsel*

51

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 10,142 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____/s/ Lorenzo Di Silvio_____
LORENZO DI SILVIO
